UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CHARLES MIKICH, | No. C 11-04629 DMR |
| Plaintiff(s), | **ORDER RE PARTIES' JOINT DISCOVERY LETTER [DOCKET NO. 34]** |
| v. | |
| COUNTY OF SAN FRANCISCO, ET AL, | |
| Defendant(s). | |

This discovery dispute concerns Plaintiff Charles Mikich's refusal to answer questions about his financial condition during his deposition per instruction of his counsel. Pursuant to 42 U.S.C. § 1983, Plaintiffs Charles and Alexis Mikich allege that social workers from Defendant City of San Francisco violated their civil rights by taking their newborn child, A.M., from their custody without obtaining a warrant from juvenile court. Plaintiffs also bring a state law claim for intentional infliction of emotional distress. As no party contends that a warrant was issued, a substantial portion of the case will turn on whether exigent circumstances showing that the child was in imminent danger existed at the time in question. *See Mabe v. San Bernardino Cnty.*, 237 F.3d 1101, 1107 (9th Cir. 2001) (citations omitted). The court conducted a hearing on this dispute on October 25, 2012. During the hearing, Plaintiffs' counsel raised the argument that "the state can never consider financial resources, the ability to financially provide or materially provide for a child in making a removal decision under exigent circumstances." (Hr'g Tr. 28:10-13, Oct. 25, 2012; *see* Hr'g Tr. 20:13-19.) Plaintiffs therefore contend that any financial information about Plaintiffs is irrelevant to the case and, thus, not discoverable. The court ordered the parties to submit supplemental briefing on the matter. [Docket No. 36.] This order memorializes the court's findings.

**A. Defendants' Arguments**

According to Defendants[1], Plaintiffs spent the first three months of Alexis's pregnancy living in a tent in the woods near Santa Barbara and consulted a doctor only three times. In June 2010, they moved to San Francisco, where Alexis received no prenatal care, with the exception of one trip to the emergency room, until she gave birth to A.M. that winter. A.M. was born at full term, though severely underweight at four pounds and four ounces. Alexis also tested positive for marijuana at birth. Based on these facts, a UCSF social worker referred the case to the City's Department of Children and Family Services.

The referral was assigned to social worker Bonnie Dickerson, who met with Plaintiffs while A.M. was still in the hospital. According to Defendants, Plaintiffs refused to allow social workers to perform a home assessment and failed to show that they had made any preparations for their baby's arrival, including purchasing clothes, formula, a crib, a car seat, or any other supplies. Given the absence of a safe place to stay and any evidence that Plaintiffs had obtained the necessities for care of a newborn, the issue of whether Plaintiffs could afford to purchase such supplies for A.M. became critical.

Defendants aver that Ms. Dickerson's investigation raised other concerns about A.M.'s safety. For example, Ms. Dickerson learned that Mr. Mikich's first child had been removed from his custody in 2003 for criminal neglect after he abandoned his newborn on the beach, sunburned and covered in bug bites. When Ms. Dickerson asked Mr. Mikich about this incident, he falsely claimed that the child was removed because the mother was a prostitute. This misrepresentation caused Ms. Dickerson to question Mr. Mikich's credibility. Fueling this concern, Plaintiffs repeatedly changed their story about where they planned to take A.M. after discharge. At one point, Plaintiffs claimed that they planned to take A.M. to Exeter, California, to live with a friend they had met a few months before on Hippie Hill in Golden Gate Park. At other points, Plaintiffs stated that they planned to remain with Mr. Mikich's disabled step-father or rent an apartment in San Francisco. Defendants note that in his deposition, third-party witness Steven Brazius, an acquaintance of Plaintiffs, cast

---

[1] The facts in this case are disputed. The court presents the parties' versions of the facts in order to set the context for determining the scope of relevant discovery. This order should not be construed as making any factual determinations.

doubt upon the veracity of Plaintiffs' purported lodging plans following A.M.'s birth, when he testified that they had no definite plans about where to live and that Plaintiffs' income came from selling drugs.

After completing her investigation, Ms. Dickerson concluded that A.M. would be in substantial and immediate danger if she left the hospital with Plaintiffs and, therefore, took custody of A.M. until dependency proceedings began five days later. Defendants eventually returned A.M. to Plaintiffs' custody.

In this broader context, Defendants contend that information about Mr. Mikich's financial state will demonstrate whether Plaintiffs possessed the financial resources to provide a minimum level of care for the baby and thereby corroborate Ms. Dickerson's actions. Defendants also assert that the financial information will corroborate Ms. Dickerson's suspicions that Mr. Mikich was not truthfully responding to her inquiries and, therefore, was not credible. Consequently, Defendants seek the following information from Mr. Mikich: whether he had means to purchase food or baby supplies between June and December 2010; his total income from June 2010 through December 2, 2010, the date of A.M.'s birth; whether he had a bank account between June and December 2010; whether he had any investments during that time period; whether he received money as a gift during the time period; and whether he had any cash when he and his wife moved to San Francisco in June 2010.

**B. Plaintiffs' Arguments**

Plaintiffs respond that the only factual information relevant in the case is what Ms. Dickerson knew at the time of A.M.'s removal. According to Plaintiffs, because Ms. Dickerson had no knowledge of Plaintiffs' financial state at that time, Defendants cannot obtain this information now and use it to establish exigency or qualified immunity. Plaintiffs insist that Ms. Dickerson did not learn about the abandonment of Plaintiffs' earlier infant until five days after she removed A.M. from their custody; that Charles Mikich was arrested for -- not charged with or convicted of -- child endangerment; and that at the time of the child's removal, Ms. Dickerson had no knowledge of the information to which Steven Brazius has now testified. Plaintiffs also assert that their financial information is protected by the right to financial privacy under California law. Finally, Plaintiffs

3

1 point to California Welfare and Institutions Code § 300, which sets forth the legal bases for the state
2 to take custody of a child. Plaintiffs highlight that the statute states that "[n]o child shall be found to
3 be a person described by this subdivision solely due to the lack of an emergency shelter for the
4 family." Cal. Welf. & Inst. Code. § 300(b). In the joint discovery letter, Plaintiffs interpreted this
5 statute, along with federal and state case law, to indicate that the state may not take away a child
6 from the child's parents because the parents are poor. During the oral argument, however, Plaintiffs
7 made a more specific claim: that "the state can never consider financial resources, the ability to
8 financially provide or materially provide for a child in making a removal decision under exigent
9 circumstances." (Hr'g Tr. 28:10-13; *accord* Hr'g Tr. 20:13-19.)

**C. Discussion**

"Parties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P 26(b)(1). The court finds that Mr. Mikich's financial history is relevant, and a limited intrusion into his financial privacy is warranted. The right to privacy set forth in Article I, Section I of the California Constitution protects an individual's financial information and is generally recognized in federal court. *EEOC v. Cali. Psychiatric Transitions*, 258 F.R.D. 391, 395 (E.D. Cal. 2009) (citing *Johnson v. Thompson*, 971 F.2d 1487, 1497 (10th Cir. 1992)). It "is not an absolute right, but a right subject to invasion depending upon the circumstances." *Ragge v. MCA/Universal Studios*, 165 F.R.D. 601, 604 (C.D. Cal. 1995) ("[W]hen determining the existence (or not) of a constitutionally protected claim we must weigh the severity of each potential invasion of privacy. . . ." (brackets and ellipses in original)). "A plaintiff's right to privacy under California and federal law . . . must be balanced against the right of civil litigants to discover relevant facts." *Verma v. Am. Express*, No. 08-2702 SI, 2009 WL 1468720, at *1 (N.D. Cal. May 26, 2009).

The court is not persuaded by Plaintiffs' argument that the state may never consider in any manner a parent's ability to materially provide for a child when determining whether to remove the child from parental custody without a warrant. In their supplemental brief, Plaintiffs repeatedly proffer statements that sidestep the question they were tasked with briefing. Thus, Plaintiffs aver that "the state can *never* take children from parents based *solely* on their financial resources" and

4

1 "neither social workers nor the courts can separate a parent and child *simply* because the parent is
2 poor, or homeless." (Pls.' Supplemental Br. 2-3 (second and third emphases added) (quotation
3 marks omitted).) The court does not disagree. *See, e.g.*, *In re P.C.*, 165 Cal. App. 4th 98, 107
4 (2008); *In re G.S.R.*, 159 Cal. App. 4th 1202, 1212 (2008) (holding that removal of children from
5 parent's custody unlawful because decision made "*only*" basis of parent's "inability to obtain
6 suitable housing for financial reasons") ("[I]ndigency, by itself, does not make one an unfit parent
7 and 'judges [and] social workers . . . have an obligation to guard against the influence of class and
8 life style biases." (quoting *In re Cheryl E.*, 161 Cal. App. 3d 587, 607 (1984) (brackets and ellipses
9 in original)).

10 However, Plaintiffs have made the argument that the state may *never* consider a parent's
11 ability to materially provide for a child as a factor, i.e., *at all* when making a removal determination.
12 Plaintiffs present no support for this position in their supplemental briefing, nor could the court find
13 any through its own research. While poverty *per se* is not a legitimate reason for removing a child
14 from parental custody, courts have taken into account factors that implicate the ability to materially
15 provide, in conjunction with others, when making exigent removal determinations. *See Jarovits v.*
16 *Monroe Cnty. Children & Youth Servs.*, 345 F. App'x 784, 787 (3d Cir. 2009) (taking squalid
17 conditions of home into consideration in removal case); *Rogers v. Cnty. of San Joaquin*, 487 F.3d
18 1288, 1293-95 (9th Cir. 2007) (same); *Campbell v. Burt*, 141 F.3d 927, 928 (9th Cir. 1998) (same);
19 *Hudson v. City of Salem*, No. 07-226, 2009 WL 1227770, at *24 (D. Or. May 1, 2009) (noting that
20 "squalor" can pose imminent risk to child and form basis for removal); *Kuhn v. Wash. State Dep't of*
21 *Soc. & Health Servs.*, No. 04-5294, 2006 WL 314542, at *7 (W.D. Wash. Feb. 9, 2006) (noting that
22 observations considered in exigent removal of children included "mud, garbage, nearly dark on a
23 January day, no adults present, possibly no water or electrical hookups," though court found no
24 exigent circumstances warranting removal). Certainly, no court has held that the state is prohibited
25 from considering any fact that might implicate in some way the ability of a parent to materially
26 provide for a child.

27 In light of the specific facts of the present case, the court finds that narrow discovery into the
28 state of Mr. Mikich's finances at the time of A.M.'s removal is relevant because it goes to the

5

reasonableness of Ms. Dickerson's assessment of his credibility. One of the factors that she alleges that she relied upon when deciding whether A.M. should remain with her parents was her determination that Mr. Mikich was not providing credible responses to her inquiries about his ability to provide adequate care, e.g. clothes, food, a place to sleep, and other supplies, for A.M. Even though Ms. Dickerson did not know Mr. Mikich's financial state at the time she made the decision to remove the child without a warrant, Mr. Mikich's actual financial situation at the time may shed light on the reasonableness of Ms. Dickerson's conclusions as to his credibility. *See T.D.W. v. Riverside Cnty.*, No. CV 08-232, 2010 WL 1006618, at *4 (C.D. Cal. Mar. 11, 2010) (citing *Turner v. White*, 980 F.2d 1180, 1183 (8th Cir. 1992)). To preserve a proper balance between Mr. Mikich's privacy rights and Defendants' need for discovery, the court limits the scope of the inquires into his financial history. Defendants may ask Mr. Mikich only how much money he had (or had access to) at the time of A.M.'s removal. Defendants may not ask about Mr. Mikich's employment or bank accounts, nor may they inquire into any financial information pre-dating December 2010.

The court emphasizes the limits of its ruling. This is a discovery order. The law regarding warrantless removal of children from parental custody does not appear to prohibit all inquiries by state actors into areas that may implicate a parent's ability to materially provide for a child. Therefore, the court cannot rule out discovery relating to such inquiries as a matter of law. Here, the court merely finds that the limited financial information is discoverable because it may be relevant to corroborate the social worker's conclusions as to the credibility of the information that Mr. Mikich provided to her. The court makes no ruling as to whether exigency existed, or whether Ms. Dickerson's inquiries were entirely appropriate.

IT IS SO ORDERED.

Dated: December 5, 2012

DONNA M. RYU
United States Magistrate Judge

6