**United States District Court**
For the Northern District of California

1
2
3
4
5
6
7
8                                    UNITED STATES DISTRICT COURT

9                                  NORTHERN DISTRICT OF CALIFORNIA

10

11   CHARLES MIKICH,                              No. C-11-04629 DMR

12              Plaintiff(s),                      ORDER GRANTING DEFENDANTS'
                                                   MOTION FOR SUMMARY JUDGMENT
13        v.

14   COUNTY OF SAN FRANCISCO, ET AL,

15              Defendant(s).
     _____/
16

17
           Plaintiffs Charles and Alexis Mikich filed suit to challenge the warrantless removal of their
18
     newborn child, A.M., from their custody.  Defendants County of San Francisco, Bonnie Dickerson,
19
     and Dan Phillips move pursuant to Federal Rule of Civil Procedure 56 for summary judgment.  For
20
     the reasons provided below, the court grants the motion and dismisses this case.
21
                                          **I. Background**
22
     **A. A.M.'s Birth and Removal**
23
           On December 2, 2010, Plaintiffs' child, A.M., was born two weeks before term at the
24
     University of California San Francisco ("UCSF") Hospital.  (Am. Joint Statement of Undisputed
25
     Facts ("Am. Undisputed Facts") ¶¶ 1-2.)  She weighed four pounds and three ounces, (Am.
26
     Undisputed Facts ¶ 2), and had APGAR scores of 9 of 9, (Dickerson Dep. 156:20-157:7; Terry Decl.
27
     Ex. K (Dickerson's Dec. 12, 2010 TDM/Admission Request Form).)  Due to A.M.'s low birth
28

weight, doctors ordered that she remain in the hospital until her weight increased and health stabilized.  (Alexis Mikich Dep. ("Alexis Dep.") 255:17-21; Dickerson Decl. ¶ 4; Charles Mikich Dep. ("Charles Dep.") 183:19-22.)  During the hospital stay, Alexis had no problems breastfeeding A.M.  (Charles Dep. 184:9-13; Terry Decl. Exs. D (Dickerson's Dec. 6, 2010 Delivered Service Log), K.)

Less than two days after giving birth, Alexis spoke with UCSF social worker Diana Corey.  (Alexis Dep. 279:4-280:3; Charles Dep. 185:9-186:10.)  As a mandatory reporter under state law, Corey conducted an investigation into whether to refer Plaintiffs to the City and County of San Francisco's Human Services Agency, Family and Children's Services Division ("the County").  (Dickerson Decl. ¶¶ 3-4, Ex. A.)  During the investigation, Corey spoke with Plaintiffs and medical personnel, and concluded that A.M. could be at risk if discharged into Plaintiffs' custody.  (Dickerson Decl. ¶¶ 3-4, Ex. A; Alexis Dep. 279:4-280:3.)  On December 6, 2010, Corey reported Plaintiffs to the County by calling the Children's Emergency Services hotline.  (Dickerson Decl. ¶¶ 3-4, Ex. A.)  She provided information to a hotline call screener, who entered the data into an Emergency Response Referral Information form.  (Am. Undisputed Facts ¶ 4.)  In relevant part, Corey reported the following:

> This young family was living in a tent in Santa Barbara until 4 months ago when they moved to SF to stay with paternal step grandfather.  They are now living in a studio apartment with 6 people.  The family has extremely poor hygiene: they are malodorous and very unkempt looking.  They have no income.  Mother only had one prenatal visit and never came back for followup.  Baby born extremely small for full term (4lbs 3 oz) and they believe this is because mother had poor nutrition during pregnancy.  Mother is emotionally immature and seems to have a low expectation of her life, she also admitted to feeling emotionally overwhelmed.  When the reporter asked about the father and the future of not working and not having a home, the mother replied, "I don't mind if we are poor, he loves me."

(Am. Undisputed Facts ¶ 5.)  Corey's report also indicated that A.M. "is due to be released from [the] hospital on Thursday or Friday," December 9 or 10, 2010.  (Dickerson Decl. Ex. A.)

The case was assigned to social worker Bonnie Dickerson for investigation.  (Am. Undisputed Facts ¶ 6.)  Dickerson received the Emergency Response Referral form on December 6, 2010 and went to UCSF to meet Plaintiffs and A.M. that same day.  (Am. Undisputed Facts ¶ 7.)  At Dickerson's first meeting with Plaintiffs, she explained to them that there would be a Team Decision

Meeting ("TDM") on December 9, 2010, at which they would discuss the custody of A.M., who might have to go into foster care. (Alexis Dep. 263:12-21, 273:8-12.)

 As a part of her investigation, Dickerson attempted to determine whether discharging A.M. into Plaintiffs' custody would pose an immediate and substantial risk to A.M.'s safety. (Am. Undisputed Facts ¶ 8.) She interviewed Plaintiffs individually. She also spoke or attempted to speak with others, including her supervisor Dan Phillips, Corey, social workers from other counties where Plaintiffs had lived or possibly planned to live, and Plaintiffs' friend Jose Rodriguez. (Dickerson Decl. ¶ 5.) Dickerson held the TDM on December 9, 2012. (Dickerson Decl. ¶ 5.) The TDM Action Report lists two options: (A) that A.M. would go into foster care upon discharge; or (B) that A.M. would be placed with her biological parents. (Terry Decl. Ex. E (TDM Action Report).) However, for A.M. to remain with her parents, Plaintiffs would have to allow Dickerson to perform a home assessment, or move into a homeless shelter. (Dickerson Dep. 253:9-254:24; Charles Dep. 251:19-252:2.)

 On Friday, December 10, 2010, upon learning that hospital staff had approved A.M. for discharge that day, Dickerson removed A.M. from Plaintiffs' custody without a warrant. (Dickerson Decl. ¶ 6.) She concluded that she had to take immediate action to protect A.M. from imminent and substantial danger, and that she had insufficient time to obtain a warrant prior to removal. (Dickerson Decl. ¶ 23.)

 Dickerson based her decision to remove A.M. without a warrant on the grounds discussed below. The parties agree that the law requires the fact finder to focus on the information known to Dickerson at the time she removed A.M. from her parents' custody.[1]

•  Dickerson knew that A.M. had arrived two weeks premature and had a low birth weight of four pounds and three ounces, which Dickerson understood to make A.M. an exceptionally fragile and vulnerable infant requiring a heightened level of parental care and attentiveness. (Dickerson Decl. ¶¶ 4, 7.) Corey told Dickerson that the hospital doctors believed that A.M.'s

---

[1] To provide a richer context from which to understand the events leading up to the removal, the court has also included some facts not known to Dickerson at the time of A.M.'s removal, in particular, information provided by Plaintiffs that elaborates upon the facts known to Dickerson. The court cannot, and has not considered such facts in its legal analysis.

low birth weight stemmed from *in utero* malnourishment.  (Dickerson Decl. ¶ 4, Ex. B.)

Alexis, however, had informed Dickerson that babies in her family tended to be small at

birth.  (Alexis Dep. 252:20-24.)  Dickerson concluded that A.M.'s low birth weight, in

conjunction with the doctors' estimation of its cause, suggested that Plaintiffs had made poor

decisions which had endangered A.M. as a fetus and that Plaintiffs could not be trusted to

properly care for A.M.  (Dickerson Decl. ¶ 8.)

• Dickerson knew that Alexis received no prenatal care during the last five months of her

pregnancy, that she had two visits at UCSF while in San Francisco, and that she had declined

to come back for follow-up visits.  Dickerson knew that this likely meant that Alexis did not

receive the usual tests and screenings given to expectant mothers.  Dickerson concluded that

the poor prenatal care showed Plaintiffs' immaturity and poor judgment when it came to

caring for A.M., (Dickerson Decl. ¶ 9), which could subject A.M. to "severe neglect."

(Dickerson Dep. 157:8-13.)  Alexis testified that during the first four months of her

pregnancy, she saw a doctor for prenatal care three times.  (Am. Undisputed Facts ¶ 9.)

During the latter half of her pregnancy, Alexis had no prenatal care and saw a doctor twice.

(Alexis Dep.167:1-168:18, 169:22-25,172:5-20; Charles Dep. 118:13-25, 119:24-120:8.)

The first of these two visits was an introductory visit at UCSF's Children's Hospital in

August 2010, during which no tests or examinations were performed.  (Alexis Dep.

167:1-168:18, 169:22-25, 172:5-10; Charles Dep. 118:13-25, 119:24-120:8.)  During that

visit, doctors recommended that she schedule a follow-up, but she failed to do so because she

"didn't feel like [she] needed to." (Alexis Dep. 173:4-7, 185:4-10.)  Her second visit occurred

in September 2010, when she went to the UCSF emergency room because of vaginal

bleeding.  (Alexis Dep. 172:11-15; Charles Dep. 118:13-25, 119:24-120:8.)  A doctor

recommended that she schedule a follow-up visit, but Alexis did not do so because her

motherly instinct told her that it was unnecessary.  (Alexis Dep. 173:4-7, 173:20-174:3,

183:15-184:1-14, 269:17-270:8.)  After that visit, Alexis did not see a doctor until she gave

birth to A.M. two months later.  (Am. Undisputed Facts ¶ 10.)

**United States District Court**
For the Northern District of California

- Dickerson knew that Alexis had only taken prenatal vitamins for five days.  Dickerson believed this decision reflected poorly on Plaintiffs' judgment and showed "a willingness to make decisions that could endanger A.M., or at least a lack of awareness of the potentially harmful consequences of these decisions."  (Dickerson Decl. ¶ 10.)  Alexis testified that she stopped taking the prenatal vitamins because they exacerbated her morning sickness, but that she continued to take multivitamins.  (Alexis Dep. 87:12-88:23; Alexis Dep. 270:9-18; Terry Decl. Ex. D.)

- A urinalysis performed on Alexis after delivery came back positive for marijuana.  (Am. Undisputed Facts. ¶ 3.)  Dickerson concluded that Alexis's decision to smoke marijuana during her pregnancy demonstrated that Alexis lacked the maturity and good judgment to care for A.M.  (Dickerson Decl. ¶ 11.)  Although not known to Dickerson, it appears that Alexis smoked marijuana approximately ten times during her pregnancy, taking no more than three puffs on each occasion, to mitigate her extreme nausea.  (Charles Decl. 44:18-45:25.)  Doctors in Santa Barbara and at UCSF told Plaintiffs that such limited use was "fine" or "okay."  (Charles Dep. 46:2-15, 125:25-126:8.)

- Plaintiffs lived in a six-by-six foot tent in the woods during the first four months of Alexis's pregnancy.  (Dickerson Decl. ¶ 12; Alexis Dep. 20:6-8, 56:13-17, 106:12-15, 270:9-13, 292:13-17; Charles Dep. 35:1-4, 21-25, 42:2-22.)  Dickerson believed this choice reflected poorly on Plaintiffs' parental judgment and maturity.  (Dickerson Decl. ¶ 12.)

- Plaintiffs provided Dickerson with varying plans about where they intended to live with A.M. after the hospital discharged her, which led Dickerson to conclude that Plaintiffs did not know where they would take A.M. and that they did not have a suitable shelter available to meet their newborn's needs.  (Dickerson Decl. ¶ 13.)  Alexis told Dickerson that they would temporarily return to the studio apartment they had been sharing with Charles's step-father, Edward Chambers.  (Dickerson Decl. ¶ 13; Alexis Dep. 214:16-19, 243:17-244:3, 267:10-268:13.)  Alexis informed her that they then would look for an apartment to rent and remain in San Francisco.  (Dickerson Decl. ¶ 13, Alexis Dep. 224:11-25, 269:8-10; Charles Dep. 129:5-10, 162:17-22; Terry Decl. Ex. D.)  Plaintiffs also

United States District Court

For the Northern District of California

had a plan to move to Exeter, California to live with an acquaintance, Jose Rodriguez. (Dickerson Decl. ¶ 13; Alexis Dep.   193:14-16, 207:16-23, 268:18-22, 269:4-7; Charles Dep. 129:11-130:1.)  Despite telling Dickerson about their attempts to secure an apartment in San Francisco, Alexis informed Dickerson that moving to Exeter was their plan "100 percent."  (Alexis Dep. 268:18-22; Charles Dep. 207:14-16, 209:10-25.)  Confronted with what she considered to be inconsistent narratives, Dickerson did not know where Plaintiffs would go after the hospital discharged A.M., and was not confident that Plaintiffs knew either.  (Dickerson Decl. ¶ 15.)  A.M.'s fragility, the winter months ahead, Plaintiffs' perceived poor judgment and immaturity, and Plaintiffs' shifting housing plans, all bolstered Dickerson's belief that A.M. would be in immediate and substantial danger if discharged from the hospital into Plaintiffs' custody. (Dickerson Decl. ¶ 15.)

- Plaintiffs refused to allow Dickerson to perform an on-site assessment of any of the homes in which they claimed they would live with A.M.  (Dickerson Decl. ¶ 16; Am. Undisputed Facts ¶ 14.)  They did not allow an assessment of Chambers' apartment, where they had been living, because they believed that it was not suitable for a newborn; that Chambers did not like strangers in his apartment; that Chambers did not want a newborn in his apartment; and that Plaintiffs were not planning to live there anyway.  (Dickerson Decl. ¶ 16; Alexis Dep. 267:10-268:13, 277:22-278:10; Charles Dep. 205:17-207:3.)  Dickerson also was not able to assess Rodriguez's home in Exeter, even though Plaintiffs agreed to an assessment and provided Dickerson with Rodriguez's contact information.  (Dickerson Decl. ¶ 16; Charles Dep. 207:14-217:15.)  According to Dickerson, these impediments precluded her from determining whether Plaintiffs had a safe place to house A.M.  (Dickerson Decl. ¶ 16.)

- In addition, Plaintiffs had made no preparation to enter a homeless shelter.  (Dickerson Decl. ¶ 21; Alexis Dep. 190:11-21, 298:24-299:15.)  Dickerson knew that it could take days or weeks for parents with a newborn to secure a place in a shelter.  Plaintiffs' failure to make advance preparations indicated to Dickerson that Plaintiffs would have no suitable place to live upon A.M.'s discharge.  (Dickerson Decl. ¶ 21.)

- Dickerson knew that in 2003, Charles had lost custody of his first child, who was eleven months old, due to serious neglect. (Dickerson Decl. ¶ 17; Terry Decl. Ex. D.) Dickerson inferred from this event that Charles' parenting ability was deficient. (Dickerson Decl. ¶ 17.)

- When Dickerson asked Charles about the removal of his first child, he stated that the infant had been removed and placed into adoption solely due to his then-wife's behavior. (Dickerson Decl. ¶ 18; Charles Dep. 226:25-229:12, 233:2-235:16, 240:3-21; Alexis Dep. 310:6-313:15.) According to Dickerson, she knew that Charles was lying, because from her experience, a child is not removed from parental custody due to only one parent's neglect. (Dickerson Decl. ¶ 18.) Charles's untruthful explanation caused Dickerson to doubt his credibility with respect to other issues. (Dickerson Decl. ¶ 18.)

- Dickerson believed that Plaintiffs had provided conflicting information about whether they had the resources to care for A.M. (Dickerson Decl. ¶ 19.) Dickerson knew that Alexis had informed Corey that Plaintiffs had no income, ( Dickerson Decl. ¶ 19), but Plaintiffs had informed Dickerson that Charles was doing odd jobs for cash under the table. This discrepancy increased Dickerson's distrust of Plaintiffs. (Dickerson Decl. ¶ 19; Alexis Dep. 270:23-271:9; Terry Decl. Ex. D; Charles Dep. 46:21-47:8, 83:2-19, 85:1-7.)

- Dickerson felt that Plaintiffs did not demonstrate that they had made adequate preparations for A.M.'s arrival. Although Plaintiffs claimed to have some basic items for the baby, Dickerson could not verify that claim because Plaintiffs refused a home assessment, and were not believable. (Dickerson Decl. ¶ 20.) Dickerson also knew that Plaintiffs had not applied for governmental assistance, including welfare, food stamps, or other forms of cash aid, since their arrival in San Francisco. (Dickerson Decl. ¶ 20; Am. Undisputed Facts ¶ 12.) When Alexis had checked into the hospital, she said that she did not have a car seat, crib, or stroller. (Am. Undisputed Facts ¶ 11.) She informed Dickerson, however, that they had a crib and car seat available in Exeter. (Alexis Dep. 271:11-19.) Although Plaintiffs claimed to have diapers and blankets, (Alexis Dep. 189:24-190:8; Terry Decl. Ex. D), their refusal to allow Dickerson to perform a homeassessment prevented her from verifying their assertions. (Dickerson Decl. ¶ 20.) According to Plaintiffs, Dickerson was aware, though, that they had

United States District Court

For the Northern District of California

brought food stamps with them from Santa Barbara.  (Alexis Dep. 271:20-23; Terry Decl. Ex. D.)

•     Dickerson made inquiries and learned that Plaintiffs had no family members or close friends in the area who could take temporary custody of A.M. in the event a decision were made to remove her from Plaintiffs' custody.  (Dickerson Decl. ¶ 22; Am. Undisputed Facts ¶ 13.)

On December 10, 2010, once Dickerson learned that A.M. was ready for discharge from the hospital, she concluded that she had to act immediately to protect A.M. from imminent and substantial danger, and that there was no feasible option other than removal.  (Dickerson Decl. ¶ 23.) Dickerson knew that once the hospital determined that a child was healthy enough to be discharged, the child could not remain there any longer.  (Dickerson Decl. ¶ 23.)  Dickerson summarized the driving concerns behind her conclusion that A.M. faced a substantial and imminent risk to her safety that justified A.M.'s warrantless removal from her parents:

> A.M. remained extremely fragile, more so than other newborns, and I had no idea where Plaintiffs planned to take her or whether they had the necessities to care for her.  Plaintiffs refused an assessment of Mr. Chambers' apartment, and Plaintiffs had consistently demonstrated poor judgment when it came to caring for newborns. Alexis rejected proper prenatal care, stopped taking prenatal vitamins, smoked marijuana repeatedly, and during pregnancy failed to observe a diet sufficient to avoid a malnourished newborn. . .  Finally, Plaintiffs had no credibility, and I disbelieved what they told me about their plans and abilities to care for A.M.

(Dickerson Decl. ¶ 23.)

Phillips approved Dickerson's decision to remove A.M.  (Am. Undisputed Facts ¶ 15.)  A.M. was discharged into foster care at 7:00 p.m on the evening of December 10, 2010.  (Terry Decl. Ex. G.)  The discharge papers contained no special instructions for A.M.'s continued care and recommended a follow-up visit in three days.  (Terry Decl. Ex. G.)  Inpatient progress notes from the same day noted that A.M. had been breastfeeding sufficiently and that she was able to maintain her body temperature.  (Terry Decl. Ex. L.)

**B. Dickerson's Post-Removal Investigation**

After A.M.'s removal, Dickerson continued to investigate whether Plaintiffs' custody would endanger the infant.  (Dickerson Decl. ¶ 26.)  Around December 14, 2012, Dickerson corroborated

1   the facts underlying the removal of Charles's first child and noted the following in a

2   contemporaneous report:

> [Charles] left child with a caretaker on 8/5/02 from 9:30 a.m [sic] to 2:30 p.m. with
> no food, water or canopy to protect child from the sun [sic].  Child was clothed in a
> filthy sweater and soiled diaper.  Child was observed to have flea bite [sic] and was
> not up-to-date with immunizations.  Pursuit [sic] to the above, [Charles] was arrested
> for child endangerment.  The Detention Petition was held in abeyance pending
> relinquishment of child to a private adoption.  Santa Barbara CPS also reported that
> the father was homeless and living on the beach.

7   (Terry Decl. Ex. D; Dickerson Decl. ¶ 26; Phillips Decl. ¶ 4.)  This information further undermined

8   Charles's credibility in Dickerson's mind and showed his inadequate parenting abilities.  (Dickerson

9   Decl. ¶ 26.)  In preparation for the custody hearing, on December 14, 2010, Dickerson submitted a

10   detention report to the court that summarized her investigation and recommended that A.M. remain

11   in foster care on the basis of "General Neglect."  (Dickerson Decl. Ex. B; Dickerson Decl. ¶ 27.)

12   **C. The Dependency Hearing**

13   A.M. remained in foster care for five days, from Friday, December 10 to Wednesday,

14   December 15, 2010.  (Am. Undisputed Facts. ¶ 16.)  On December 15, 2010, the dependency court

15   heard arguments about whether A.M. should remain in foster care.  (Am. Undisputed Facts ¶ 16.)

16   One of the central issues at the hearing was whether Plaintiffs had a suitable place to live with their

17   newborn.  (Dickerson Decl. ¶ 28.)  Plaintiffs' counsel indicated that he would pay for Plaintiffs to

18   stay in a hotel for a period of time.  (Am. Undisputed Facts. ¶ 16.)  The court returned A.M. to

19   Plaintiffs' care at the conclusion of the hearing based on counsel's promise to provide Plaintiffs with

20   a hotel room.  (Dickerson Decl. ¶ 25.)  After two weeks in the hotel, Plaintiffs moved into a

21   homeless shelter.  (Alexis Dep. 317:6-9.)

22   **D. Policies, Training, and Practices**

23   The County identified Sharon Bell as the person most knowledgeable about its policies,

24   practices, training, and procedures concerning child abuse and/or neglect referrals, taking children

25   into protective custody, and similar matters.  Bell submitted to a deposition on January 18, 2013.

26   According to her testimony, from 2010 through the present, new and existing "social workers are

27   trained in the warrant protocols."  (Bell Dep. 41:1-22.)  She has no recollection of an emergency

28   response social worker, such as Dickerson, having used a warrant to remove a child.  (Bell Dep.

United States District Court

For the Northern District of California

64:25-65:5.)  It is her experience that when other types of social workers have sought warrants, it has taken "about 24 hours," though the time has ranged from eight or nine hours to two or three days.  (Bell Dep. 72:15-18, 74:8-20.)

Phillips, who has worked as a social worker for the County since 1989 and was Dickerson's supervisor in December 2010, initially testified that, as of December 2010, neither he nor any social workers under his supervision had ever applied for a protective custodial warrant to remove a child. (Phillips Decl. ¶¶ 1-2; Phillips Dep. 135:1-14, 142:8-19.)  He also averred that prior to December 2010, he had never received training from the County "regarding the use of protective custody warrants . . . to remove a child" from parental custody, (Phillips Dep. 135:21-25, 136:7-14), and was "not familiar with any circumstances within the City or County of San Francisco Child Protective Services in which a Child Protective Services worker would file an actual warrant application asking a judge to authorize the removal of a child." (Phillips Dep. 139:3-9.)  In fact, he explicitly stated that it is not protocol "to get a judge's approval to remove a child."  (Phillips Dep. 136:19-24.) However, after taking a five-minute break, during which he spoke with his counsel, Philips disavowed his previous statements:

> Yeah, I'd like to correct . . . my testimony because it was – I was confused by the question.  So in emergency response, we have exigency when we remove a child. There could – there are situations where you have a chronic condition where there isn't exigency, but the child needs to be removed from the home.  And – and in those situations, we would go to the court to get – you know, to get a warrant to remove the child.

(Phillips Dep. 140:2-12.)

During her twenty-two years as a social worker with the County prior to this matter, Dickerson attests that she received training "on what the standards are under federal law in order to remove a child without a warrant and avoid civil liability," and understood the standard to be "[i]mmediate and imminent risk [of danger] to a child." (Dickerson Dep. 70:17-24, 71:1-7, 21-25.) During the course of her employment, Dickerson has obtained approximately six protective custody warrants to remove children.  (Dickerson Dep. 68:4-12.)  From her experience, obtaining custody warrants has taken approximately twenty-four hours.  (Dickerson Dep. 124:5-12.)  Dickerson attached a training manual to her declaration; the manual, produced by the San Francisco Human

**United States District Court**
For the Northern District of California

1  Services Agency, effective January 6, 2009, details when a social worker may take a child into

2  protective custody and what constitutes "exigent circumstances." (Dickerson Decl. Ex. C.)

3  <center>**II. Procedural History**</center>

4    Plaintiffs brought suit on September 19, 2011, [*see* Docket No. 1], and filed an amended

5  complaint on October 6, 2011, [Docket No. 6]. Their first two claims allege, pursuant to 42 U.S.C. §

6  1983, that Defendants Dickerson and Phillips (together, "Individual Defendants") violated Plaintiffs'

7  right to familial association (1) by removing A.M. from their custody "without consent, probable

8  cause, a protective custody warrant, or exigent circumstances justifying removal," (Am. Compl. ¶

9  57; *see* Am. Compl. ¶¶ 56-58), and (2) by continuing to detain A.M. pending a trial by the juvenile

10  court on the issue of jurisdiction over A.M. without a "court order, warrant, or exigent

11  circumstances," (Am. Compl. ¶ 60; *see* Am. Compl. ¶¶ 59-64). Plaintiffs' third cause of action, also

12  against the Individual Defendants, alleges intentional infliction of emotional distress. (Am. Compl.

13  ¶¶ 65-68.) Plaintiff's final claim seeks to impose liability on the County of San Francisco for

14  maintaining "established and/or followed policies, procedures, customs, and/or practices" which

15  gave rise to the aforementioned civil rights violations. (Am. Compl. ¶ 70; *accord* Am. Comp. ¶¶

16  69-76.) *See Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978).

17    Defendants now move for summary judgment against all of Plaintiffs' claims. Both parties

18  have consented to this court's jurisdiction pursuant to 28 U.S.C. § 636(c). [Docket Nos. 8, 10.] As a

19  result, the court may enter judgment in the case. *See* 28 U.S.C. § 636(c)(1); Fed. R. Civ. P. 72(b);

20  N.D. Cal. Civ. L.R. 72-1.

21  <center>**III. Summary Judgment Standard**</center>

22    A court shall grant summary judgment "if . . . there is no genuine dispute as to any material

23  fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden of

24  establishing the absence of a genuine issue of material fact lies with the moving party, *see Celotex*

25  *Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986), and the court must view the evidence in the light

26  most favorable to the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)

27  (citation omitted). A genuine factual issue exists if, taking into account the burdens of production

28  and proof that would be required at trial, sufficient evidence favors the non-movant such that a

<center>11</center>

United States District Court

For the Northern District of California

1    reasonable jury could return a verdict in that party's favor.  *Id.* at 248.  The court may not weigh the

2    evidence, assess the credibility of witnesses, or resolve issues of fact.  *See id.* at 249.

3         To defeat summary judgment once the moving party has met its burden, the nonmoving

4    party may not simply rely on the pleadings, but must produce significant probative evidence, by

5    affidavit or as otherwise provided by Federal Rule of Civil Procedure 56, supporting the claim that a

6    genuine issue of material fact exists.  *TW Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d

7    626, 630 (9th Cir. 1987).  In other words, there must exist more than "a scintilla of evidence" to

8    support the non-moving party's claims, *Anderson*, 477 U.S. at 252; conclusory assertions will not

9    suffice.  *See Thornhill Publ'g Co. v. GTE Corp.*, 594 F.2d 730, 738 (9th Cir. 1979).  Similarly,

10   "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the

11   record, so that no reasonable jury could believe it, a court should not adopt that version of the facts"

12   when ruling on the motion.  *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### IV. Discussion

**A. Plaintiffs' Section 1983 Claims Against Dickerson and Phillips**

15        To prevail on a Section 1983 claim, a plaintiff must demonstrate that the allegedly offending

16   action (1) occurred "under color of state law" and (2) resulted in the deprivation of a constitutional

17   or federal statutory right.  *Leer v. Murphy*, 844 F.2d 628, 632-33 (9th Cir. 1988) (citations omitted).

18   The parties do not dispute that the Individual Defendants acted under the color of state law during

19   the events at issue.  Consequently, liability will turn on whether their actions violated Plaintiffs'

20   constitutional or statutory rights.

#### 1. The Decision to Remove A.M. from her Parents Without a Warrant

22        Plaintiffs allege that the Individual Defendants violated their constitutional rights when they

23   removed A.M. from their custody without obtaining a warrant.  (Am. Compl. ¶¶ 56-58.)  In their

24   motion for summary judgment, Defendants argue that they did not violate Plaintiffs' civil rights

25   because exigent circumstances permitted a warrantless removal.  (Defs.' Mot. 15-19.)

26        Parents and children have a "well-elaborated constitutional right," embodied as a liberty

27   interest protected by the Fourteenth Amendment, "to live together without governmental

28   interference."  *Wallis v. Spencer*, 202 F.3d 1126, 1136 (9th Cir. 2000) (citations omitted).  This right

United States District Court

For the Northern District of California

1    guarantees that the state may not separate parents from their children without due process except in

2    an emergency. *Id.* Stated differently, a government official must "obtain prior judicial

3    authorization," usually through a warrant, "before intruding on a parent's custody of her child,"

4    unless the official has information "*at the time of the seizure* that establishes 'reasonable cause to

5    believe that the child is in imminent danger of serious bodily injury and that the scope of the

6    intrusion is reasonably necessary to avert that specific injury.'" *Mabe v. San Bernardino Cnty.*, 237

7    F.3d 1101, 1106 (9th Cir. 2001) (quoting *Wallis*, 202 F.3d at 1138) (emphasis added).  Evaluation of

8    whether information provided an official reasonable cause to believe there are such exigent

9    circumstances is an objective standard and not dependent on the subjective conclusions of the

10   official in question. *See Wallis*, 202 F.3d at 1138, 1139 n.9.

11        The parties agree that the Individual Defendants removed A.M. from Plaintiffs' custody

12   without a warrant.  Whether the Individual Defendants violated Plaintiffs' constitutional rights

13   therefore rests on the existence of exigent circumstances at the time of removal.  During the motion

14   hearing, the parties conceded, and the court agrees, that there are no material factual disputes about

15   the information Dickerson knew when she removed A.M.  Nevertheless, a reasonable jury, after

16   hearing the testimony and assessing the credibility of the witnesses, could interpret the key facts

17   differently.  On the one hand, a jury could accept that Dickerson's conclusions were reasonable, and

18   find that exigent circumstances justified A.M.'s warrantless removal.  They could believe that

19   Dickerson rightfully was concerned about A.M.'s fragile state, especially when coupled with her

20   parents' immaturity and lack of judgment.  Jurors could conclude that Dickerson had given Plaintiffs

21   the opportunity to come up with verifiable housing, but that they failed to do so as of the date of

22   A.M.'s discharge.  The jurors could also find that Plaintiffs' statements reasonably caused Dickerson

23   to doubt their credibility, and that she decided that A.M. was in imminent danger and would be

24   difficult to relocate after she left the hospital.

25        However, a jury could also reasonably decide that exigent circumstances did not exist at the

26   time of A.M.'s removal, and/or that Dickerson could have obtained a warrant.  For example, a

27   reasonable jury could find that A.M. was not in imminent danger at the time of her removal, as

28   evidenced by her discharge from the hospital without any special instructions.  They could believe

United States District Court

For the Northern District of California

that Dickerson decided early on that A.M. should be removed, and that Dickerson failed to take steps to obtain a warrant (i.e., to secure judicial oversight of her removal decision), even though she could and should have.  They could conclude that Plaintiffs would have provided adequate care for their newborn, but that Dickerson judged them because of their free-spirited and unconventional lifestyle.  The court therefore denies summary judgment on the merits for this claim and turns to whether Dickerson and Phillips are entitled to qualified immunity.

The doctrine of qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  The analysis involves two inquiries.  First, taken in the light most favorable to plaintiff, the court must ask whether the facts alleged show that the officer's conduct violated a constitutional right.  *Saucier v. Katz*, 533 U.S. 194, 201 (2001). If the answer is "no," then the court need not inquire further before ruling that the officer is entitled to qualified immunity.  *Id.*  If, however, "a violation could be made out on a favorable view of the parties' submissions," the court must examine "whether the [constitutional] right was clearly established." *Id.*  "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004) (internal quotation marks omitted) (citing *Saucier*, 533 U.S. at 202).  If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate.  *Saucier*, 533 U.S. at 202.  Defendants bear the burden of proving that they are entitled to qualified immunity.  *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005).

The qualified immunity inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Brosseau*, 543 U.S. at 198 (citation and quotation marks omitted).  In other words, to qualify as "clearly established," the contours of the right must be "'sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Ram v. Rubin*, 118 F.3d 1306, 1310 (9th Cir. 1997) (quoting *Camarillo v. McCarthy*, 998 F.2d 638, 640 (9th Cir. 1993)); *accord Mabe*, 237 F.3d at 1106 (holding that qualified immunity will apply only if court determines that government official "objectively could have believed that her

14

**United States District Court**
For the Northern District of California

1    conduct was lawful").  This standard does not mean that an official receives qualified immunity

2    "'unless the very action in question has previously been held unlawful,'" *Ram*, 118 F.3d at 1306

3    (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)); "[r]ather, the unlawfulness of the

4    conduct need only have been apparent in light of preexisting law," *id.* (citing *Anderson*, 483 U.S. at

5    640).   If the law did not put the government officer on notice that his conduct would be clearly

6    unlawful, summary judgment based on qualified immunity is appropriate.  *Saucier*, 533 U.S. at 202.

7           In determining whether a right was clearly established, the court must begin its inquiry by

8    looking to binding precedent, namely, the decisional authority of the Supreme Court or the Ninth

9    Circuit.  *Boyd v. Benton County*, 374 F.3d 773, 781 (9th Cir. 2004).[2]  Ample case law attests to

10   Plaintiffs' right to not be separated from their child without due process of law except in

11   circumstances when the child faces imminent danger of serious bodily injury.  *Mabe*, 237 F.3d at

12   1107 (citing *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *Stanley v. Illinois*, 405 U.S. 645, 651

13   (1972); *Ram*, 118 F.3d at 1310).   However, the court finds that the contours of case law existing in

14   December 2010 would not have made it apparent to Dickerson and Phillips that their conduct was

15   unlawful under the circumstances that they confronted.  Stated differently, the court finds that a

16   reasonable social worker could have believed that exigent circumstances existed sufficient to

17   override the warrant requirement.

18          During the hearing, Plaintiffs pointed to *Wallis*, *Mabe*, *Rogers v. County of San Joaquin*, 487

19   F.3d 1288 (9th Cir. 2007), and *Calabretta v. Floyd*, 189 F.3d 808 (9th Cir. 1999), as demonstrating

20   the clearly unlawful nature of the Individual Defendants' actions.  These cases do establish the

21   general principle that a child cannot be removed from his or her parents without a warrant, absent

22   exigent circumstances.  They also clearly establish that the passage of time mitigates against a

23   finding of exigency.  However, the facts of these cases make them qualitatively different from the

24

_____

25          [2] *Boyd* further instructs that "when 'there are relatively few cases on point, and none of them
     are binding,' we may inquire whether the Ninth Circuit or Supreme Court, at the time the out-of-circuit
26   opinions were rendered, would have reached the same results. . . . Thus, in the absence of binding
     precedent, we 'look to whatever decisional law is available to ascertain whether the law is clearly
27   established' for qualified immunity purposes, 'including decisions of state courts, other circuits, and
     district courts.' Drummond, 343 F.3d at 1060 (quoting Malik v. Brown, 71 F.3d 724, 727 (9th
28   Cir.1995))." *Boyd,* 374 F.3d at 781.

**United States District Court**

For the Northern District of California

1   situation faced by Dickerson and Phillips, and did not provide adequate notice to them that removing

2   A.M. without a warrant would be unlawful.

3        In *Wallis*, five days after "a mental patient who had a long history of delusional disorders . . .

4   told her therapist a fantastic tale of Satanic witchcraft within her family and an impending child

5   sacrifice," police officers, incorrectly believing there to be a court order authorizing their actions,

6   seized two children, aged two and five, from their homes without parental notification.  202 F.3d at

7   1131-34.  They then took them to a hospital for highly intrusive anal and vaginal physical

8   examinations, and kept them from their parents for two and a half months.  *Id.* at 1131-35.  The court

9   reversed the district court's grant of summary judgment for the municipality and remanded the cases

10  for further proceedings.  *Id.* at 1145.

11       In *Mabe*, a young woman reported that her stepfather had sexually abused her fourteen

12  year-old older sister.  237 F.3d at 1104.  A month after the report, a social worker visited the home

13  to investigate.  *Id.*  Four days later, the social worker returned and removed the alleged victim from

14  her parents' custody without a warrant.  *Id.*  The court reversed the lower court's grant of summary

15  judgment to the social worker because it found a genuine dispute of material fact as to whether

16  exigent circumstances existed at the time of removal.  *Id.* at 1109.

17       In *Rogers*, Child Protective Services received a report that a three-year-old and a

18  five-year-old were being neglected by their parents.  487 F.3d at 1291.  Among the indicia of

19  neglect, the report detailed that the children "were not toilet-trained, were locked in their rooms at

20  night and in a room at their parents' business during the day, were not receiving medical or dental

21  care, that . . . their home was dirty and maggot-infested, and that there were unsecured guns in the

22  home."  *Id.*  The intake unit did not view the situation as an emergency and classified it as

23  warranting a response within ten days.  *Id.*  The intake unit received a similar report three days later.

24  *Id.*  Eleven days after receipt of the initial report, a social worker ventured to the family's home, but

25  left after finding nobody home.  *Id.*  She returned a week later, called two police officers, entered the

26  family's home, and removed the children from their parents without a warrant.  *Id.* at 1291-93.  The

27  Ninth Circuit reversed the district court's grant of summary judgment and qualified immunity to the

28

**United States District Court**
For the Northern District of California

1    social worker, finding that no reasonable social worker would have believed exigent circumstances

2    to exist that to warrant removing the children without prior judicial authorization.  *Id.* at 1297.

3            In *Calabretta*, an anonymous individual informed Child Protective Services about a girl

4    screaming, ""No Daddy, no,'" one night and, "'No, no, no,'" later in the afternoon.  189 F.3d at 810.

5    The report was given to a social worker who, four days after the report's receipt, went to the house to

6    investigate and noted that the children did not appear abused or neglected.  *Id.* at 810-11.  Ten days

7    later, she returned with a police officer and entered the home without consent or a warrant,

8    interrogated the children about reports of child abuse, and demanded to view the buttocks of the

9    three-year-old to determine if she had been beaten by a stick.  *Id.* at 811.  The court affirmed the

10   district court's denial of qualified immunity for the social worker.  *Id.* at 820.

11           All but one of these cases involve a significantly longer passage of time between the report

12   of abuse or neglect and the removal of the child.[3]  Each case addresses removal from known homes;

13   none raises the question of how a social worker should evaluate exigency when a child has no

14   known address, and may be difficult to locate in the future.  Moreover, none of these cases addresses

15   the fluid situation presented by the discharge of a newborn from a hospital.  Thus, the cases do not

16   provide guidance on how social workers should evaluate underweight and potentially fragile

17   newborns, whose health condition can change dramatically over the course of hours or days, and

18   who cannot verbally communicate or answer questions.  The cases also do not illuminate how a

19   social worker should evaluate exigency when an infant is going be released at an uncertain time by a

20   hospital, over which the social worker has no control.  The cases do not shed light on the issue of

21   whether exigency exists when the social worker believes an underweight newborn will be released to

22   parents who have exhibited signs of potential poor judgment and immaturity, who have given reason

23   to doubt their credibility, and whom the social worker may not be able to find after the family leaves

24   the hospital with the baby.  In sum, the general statement that a child cannot be removed without a

25

26

27          [3]  The exception, *Wallis*, involved a removal that took place five days after law enforcement
28   became aware of potential child abuse.  However, *Wallis*' otherwise dramatic and extreme factual
     circumstances make it difficult to compare to, and draw guidance for, this case.

**United States District Court**
For the Northern District of California

1    warrant absent exigent circumstances does not provide adequate guidance to a social worker facing

2    the important factual nuances present in this case.

3         The sole case that the court has found that concerns the removal of a newborn from her

4    parent also is inapposite.  In *Brown v. Montana*, a social worker, accompanied by two armed police

5    officers, entered the plaintiff's hospital room and removed her baby without obtaining a warrant

6    because (1) a nurse had reported that the plaintiff was too obese to hold her baby for more than ten

7    minutes and (2) a social worker in Alaska was seeking, but had not obtained, removal of the

8    plaintiff's older child.  442 F. Supp. 2d 982, 986, 995 (D. Mont. 2006).  In denying qualified

9    immunity, the court noted that the social worker did not claim that the concerns about plaintiff's

10   limited ability to hold her baby put the child in imminent danger.  *Id.* at 994.  The court reasoned

11   that the social worker's actions "apparently were largely based on concerns resulting from her

12   contacts with persons in Alaska [regarding the alleged neglect of plaintiff's older child]," although

13   the court pointed out that it was not clear what the social worker knew about that case at the time of

14   the removal decision.  *Id.* at 994-995.  The court concluded that the social worker had not identified

15   "specific, articulable evidence" of imminent danger, *(id.* at 995), and could not have reasonably

16   believed there to be exigent circumstances warranting removal of the infant without prior judicial

17   review.  *Id.* at 998.

18        Because the Individual Defendants' actions were not clearly unlawful, the court grants them

19   summary judgment on the basis of qualified immunity.

20                  **2. Deprivation of Familial Companionship Due to Continued Detention**

21        In their second cause of action, Plaintiffs focus on the five day period between A.M.'s

22   removal on December 10, 2010 through the December 15, 2010 custody hearing, and claim that the

23   Individual Defendants continued to violate their right of familial companionship.  (*See* Am. Compl.

24   ¶¶ 59-64.)  In their complaint and briefs, Plaintiffs do not clearly explain this claim.  In their motion,

25   the Individual Defendants contend that the exigent circumstances that permitted them to lawfully

26   remove A.M. from Plaintiffs' custody on December 10, 2010 continued through the five days leading

27   to the December 15, 2010 custody hearing.  (Defs.' Mot. 19.)  They therefore maintain that A.M.'s

28

United States District Court

For the Northern District of California

1   continued brief separation from her parents pending the hearing did not violate Plaintiffs'

2   constitutional rights.  (Defs.' Mot. 19.)

3       Government action may offend the Fourteenth Amendment by depriving parents of their

4   "fundamental liberty interest" in the companionship of their children.  *Crowe v. Cnty. of San Diego*,

5   608 F.3d 406, 441 (9th Cir. 2010).  However, courts in the Ninth Circuit appear divided on what

6   legal standard applies to determine whether this form of constitutional violation has occurred.  Some

7   courts have held that section 1983 liability attaches if the state actions separating the parents and

8   their children amount to "'[u]nwarranted state interference.'"  *Id.* (quoting *Smith v. City of Fontana*,

9   818 F.2d 1411, 1418 (9th Cir. 1987), *overruled on other grounds by Hodgers-Durgin v. de la Vina*,

10  199 F.3d 1037 (9th Cir. 1999)); *accord McCue v. S. Fork Union Elementary Sch.*, 766 F. Supp. 2d

11  1003, 1008 (E.D. Cal. 2011); *Tracy v. Washington*, Nos. 09-5588, 09-5589, 2010 WL 4511550, at

12  *10 (W.D. Wash. Nov. 2, 2010).  "Interference with the familial relationship is 'unwarranted' when

13  it is effected for the purposes of oppression."  *McCue*, 766 F. Supp. 2d at 1008-09 (citing *Smith*, 818

14  F.2d at 1420).  Other courts have held that a violation occurs when the governmental conduct is "so

15  offensive and intentional as to 'shock the conscience.'"  *Kulya v. City & Cnty. of S.F.*, No. 06-6539

16  JSW, 2008 WL 4415116, at *7 (N.D. Cal. Sept. 26, 2008) (quoting *Cnty. of Sacramento v. Lewis*,

17  523 U.S. 833, 846 (1998)); *accord Byrd v. Guess*, 137 F.3d 1126, 1134 (9th Cir. 1998), *superseded

18  by statute on other grounds*; *Barnes v. Cnty. of Placer*, 654 F. Supp. 2d 1066, 1072 (E.D. Cal. 2009).

19      The court need not resolve the question of the governing legal standard in the present motion,

20  because the court cannot rule on the merits of this claim absent a ruling on Plaintiffs' first claim.  As

21  presented in their complaint and briefing, Plaintiffs have sculpted their second claim so that the

22  constitutionality of A.M.'s continued separation from Plaintiffs is rooted in the constitutionality of

23  her initial removal – in particular, whether A.M. faced imminent danger if released to her parents.

24  As discussed above, however, whether A.M.'s initial removal violated Plaintiffs' civil rights is

25  unclear.  Defendants conceded at the motion hearing that, if the merits of Plaintiffs' first claim must

26  be presented to a jury, their second claim must as well.  Due to the interlocking nature of the claims,

27  the court agrees and, therefore, denies the Individual Defendants summary judgment on the merits.

28

**United States District Court**
For the Northern District of California

Turning to qualified immunity, it is beyond dispute that in December 2010, Plaintiffs had a right to not be separated from their child without due process of law except in circumstances when the child faces imminent danger of serious bodily injury. *Mabe*, 237 F.3d at 1107 (citing *Santosky*, 455 U.S. at 753; *Stanley*, 405 U.S. at 651; *Ram*, 118 F.3d at 1310). However, as explained previously, the case law at that time would not have made it apparent to reasonable social workers that A.M.'s removal from Plaintiffs' custody, in light of the facts known to the Individual Defendants' at the time, would have been clearly unlawful. Because the lawfulness of A.M.'s continued detention tracks that of her initial removal, case law also would not have placed the Individual Defendants on notice that their detention of A.M. for the five days pending the dependency hearing was illegal. The court therefore grants the Individual Defendants summary judgment on the basis of qualified immunity.

### B. Intentional Infliction of Emotional Distress

Plaintiffs allege that the Individual Defendants intended to cause them, or recklessly disregarded the possibility of causing them, emotional distress by removing A.M. from their custody. (Am. Compl. ¶¶ 53, 66; *see* Pls.' Opp'n 22.) Under California law, a claim for intentional infliction of emotional distress ("IIED") requires a plaintiff to show "(1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct." Christensen v. Super. Ct., 54 Cal. 3d 868, 903 (1991).

California Government Code § 820.2 provides that "a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused."[4] To qualify for this broad

---

[4] At the motion hearing, Plaintiffs argued that child protection workers are not immune from suit, citing California Government Code § 820.21. Section 820.21 in relevant part provides, "(a) Notwithstanding any other provision of the law, the civil immunity of juvenile court social workers, child protection workers, and other public employees authorized to initiate or conduct investigations or proceedings pursuant to Chapter 2 (commencing with Section 200) of Part I of Division 2 of the Welfare and Institutions Code shall not extend to any of the following, if committed with malice: (1) Perjury[;] (2) Fabrication of evidence[;] (3) Failure to disclose known exculpatory evidence[;] (4) Obtaining testimony by duress, as defined in Section 1569 of the Civil Code, fraud, as defined in either

United States District Court

For the Northern District of California

1   grant of immunity, the public employee's alleged act or omission must be discretionary in nature.

2   *Jacqueline T. v. Alameda Cnty. Child Protective Servs.*, 155 Cal. App. 4th 456, 465-66 (2007)

3   (interpreting *Barner v. Leeds*, 25 Cal. 4th 676 (2000)).   In the social worker context, actions

4   regarding investigations of child abuse or removal of minors are discretionary actions within the

5   meaning of the statute.   *See, e.g.*, *Wallis*, 202 F. 3d at 1145 (noting investigation and removal

6   decision within CPS's discretion); *Watson v. Cnty. of Santa Clara*, No. C-06-04029 RMW, 2010 WL

7   2077171, at *9 (N.D. Cal. May 20, 2010) (finding social workers' removal of child from parents'

8   custody discretionary act); *Alicia T. v. Cnty. of L.A.*, 222 Cal. App. 3d 869, 881-83 (1990) (holding

9   county and social worker immune from negligence suit involving discretionary act of investigating

10  report of child molestation) ("To protect social workers in their vital work from the harassment of

11  civil suits and to prevent any dilution of the protection afforded minors . . . social workers must be

12  absolutely immune from suits alleging the improper investigation of child abuse, removal of a minor

13  from the parental home based upon suspicion of abuse and the investigation of dependency

14  proceedings.").

15      Because Plaintiffs' IIED claim arises from the Individual Defendants' discretionary decision

16  to remove A.M., it falls within the scope of section 820.2.   The Individual Defendants thus are

17  entitled to immunity from suit.   In addition, on the factual record now before the court, no

18  reasonable jury could conclude that the Individual Defendants engaged in extreme and outrageous

19  conduct with the intention of causing emotional distress, or reckless disregard of the probability of

20  causing emotional distress, or that Plaintiffs suffered severe or extreme emotional distress as a result

21  of Defendants' outrageous conduct. The court grants summary judgment in favor of the Individual

22  Defendants on this claim.

23      **C. *Monell* Liability Against the County of San Francisco**

24  

25  Section 1572 or Section 1573 of the Civil Code, or undue influence, as defined in Section 1575 of the
    Civil Code."   Because Plaintiffs have not alleged that Individual Defendants have committed any of

26  these acts, section 820.21 is inapposite and does not preclude granting of summary judgment in favor
    of Individual Defendants.   *See Watson v. Cnty. of Santa Clara*, No. C-06-04029 RMW, 2010 WL

27  2077171, at *9 (N.D. Cal. May 20, 2010) (rejecting plaintiffs' argument in IIED suit that social worker
    not entitled to immunity if social worker committed perjury, failed to disclose exculpatory evidence,

28  or procured testimony through duress, since plaintiffs failed to establish that plaintiffs committed any
    of these acts).

United States District Court
For the Northern District of California

1    Plaintiffs claim that the County is liable under section 1983 because the County's pattern and

2    practice of failing to procure warrants to remove children from parental custody in non-exigent

3    circumstances was the moving force behind the alleged constitutional violation in this case.

4    A municipality may face section 1983 liability if it "'subjects' a person to a deprivation of

5    rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 131 S. Ct.

6    1350, 1359 (2011) (quoting *Monell v. N.Y.C. Dep't of Soc. Servs.*, 436 U.S. 658, 692 (1978)).

7    However, the municipality may be held liable "only for '[its] *own* illegal acts.'" *Id.* (quoting

8    *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986) (emphasis in original)).  It cannot be held

9    vicariously liable for its employees' actions.  *Id.* (citations omitted).  To prove municipal liability,

10    Plaintiffs "must prove that 'action pursuant to official municipal policy' caused their injury." *Id.*

11    (quoting *Monell*, 436 U.S. at 691).  Official municipal policy includes "the decisions of a

12    government's lawmakers, the acts of its policymaking officials, and practices so persistent and

13    widespread as to practically have the force of law." *Id.* (citations omitted).  Such policy or practice

14    must be a "moving force behind a violation of constitutional rights." *Dougherty v. City of Covina*,

15    654 F.3d 892, 900 (9th Cir. 2011) (citing *Monell*, 436 U.S. at 694).[5]

16    To buttress their claim, Plaintiffs point to emergency response supervisor Phillips' testimony

17    that he could not recall that he or any of the emergency response workers ever obtained a warrant.

18    (Phillips Dep. 135:1-14, 142:8-19.)  Additionally, he averred that prior to December 2010 he had not

19    received any training on the correct legal standard for removing a child from parental custody,

20    (Phillips Dep. 135:21-25, 136:7-14), and that he was not aware of any circumstance in which it

21    would be appropriate to apply for a warrant or ask a judge to authorize the removal of a child.

22    (Phillips Dep. 136:19-24.)  Sharon Bell, whom the County produced as the person most

23    knowledgeable about its policies, training, and procedures, also could not recall any emergency

24    response social worker's having sought a warrant to remove a child prior to December 2010.  (Bell

25    Dep. 64:25-65:5.)  Plaintiffs also argue that the lack of a disciplinary record against social workers

26    in the past implicitly shows the existence of a County policy of removing children without warrants

27    _____

28    [5] Plaintiffs clarified at the hearing that their *Monell* claim is not based on the County's failure to provide adequate training on removal of children under exigent circumstances.

United States District Court
For the Northern District of California

1    or exigent circumstances.  (Pls.' Opp'n 25.)  Specifically, Plaintiffs note that neither of the Individual

2    Defendants has ever been disciplined for wrongful removal of children in the past and that Bell is

3    unaware of any social worker being disciplined for failure to obtain a warrant before removing a

4    child from parental custody.[6]  (Pls.' Opp'n 25 (citing Defs.' Am. Resp. to Pls.' RFP, Ex. N; Bell Dep.

5    41:23-42:24, Ex. H).)

6         Plaintiffs fail to make out a viable *Monell* claim because they have not shown the existence

7    of prior constitutional violations by the County, let alone that a pattern or practice of removing

8    children in non-exigent circumstances without a warrant.  Plaintiffs do not point to a single prior

9    incident in which a child was removed from parental custody in the absence of exigent

10   circumstances and without a warrant or parental consent.  That social workers have never applied for

11   warrants does not demonstrate the existence of constitutional violations that would have necessitated

12   disciplinary action.  Although Plaintiffs claimed at oral argument that such violations statistically

13   must have occurred since San Francisco is a large city, such conclusory assertions do not qualify as

14   sufficient evidence to survive summary judgment.  Plaintiffs had ample opportunity to engage in

15   discovery and unearth factual support for this claim.  They have presented no such facts.  The court

16   grants summary judgment for the County.

---

24   [6]  To support their assertion that the lack of a disciplinary record demonstrates the City's
25   acquiescence to the alleged constitutional violations, Plaintiffs rely on *Hunter v. County of Sacramento*,
     in which the Ninth Circuit held it was improper to decline to use the plaintiffs' proposed jury instruction
26   that would have allowed jurors to infer a custom or practice from "evidence of repeated constitutional
     violations for which the errant municipal officers were not discharged or reprimanded." 652 F. 3d 1225,
27   1233-34 (9th Cir. 2011) (citations omitted).  However, that case is factually distinguishable from the
     record in the present matter. In *Hunter*, expert testimony showed there were prior incidents of excessive
28   force in jails that went uninvestigated by the authorities, whereas here, Plaintiffs have not shown prior
     violations or that reports of such violations went uninvestigated, *see infra. Id.* at 1227.

### V. Conclusion

For the reasons provided above, the court grants Defendants' motion for summary judgment and dismisses this case.

IT IS SO ORDERED.

Dated:  March 8, 2013

_____

DONNA M. RYU
United States Magistrate Judge